FILED
02/23/2024
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 3, 2023

## STATE OF TENNESSEE v. ROBERT BEVIS, JR. A/K/A BUTCH BEVIS

**Appeal from the Circuit Court for Dyer County**
**No. 19-CR-233      Mark L. Hayes, Judge**

_____

### No. W2022-01740-CCA-R3-CD

_____

A Dyer County Circuit Court jury convicted the Defendant, Robert Bevis, Jr., of two counts of attempted first degree premeditated murder and one count of employing a firearm during the commission of a dangerous felony, and the trial court imposed concurrent sentences of thirty-five years at eighty-five percent for the attempted murder convictions and a consecutive ten-year sentence at one hundred percent for the firearm conviction. On appeal, the Defendant argues: (1) the trial court failed to declare a mistrial in response to numerous outbursts by the victims' families; (2) the evidence is insufficient to sustain his convictions; (3) the trial court erred in overruling the defense's objection when the prosecutor misrepresented evidence during closing argument; and (4) the trial court erred in failing to instruct the jury on voluntary intoxication and attempted first degree murder without serious bodily injury. After review, we affirm the judgments of the trial court but remand the case for entry of a corrected judgment in Count 4 to reflect the accurate conviction offense of employing a firearm during the commission of a dangerous felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Brett B. Stein (on appeal), Memphis, Tennessee and Hal Dorsey (at trial), Trenton, Tennessee, for the appellant, Robert Bevis, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; and Danny Goodman, Jr., District Attorney General, for the appellee, State of Tennessee.

## OPINION

In 2019, a Dyer County Grand Jury indicted the Defendant on three counts of attempted first degree premeditated murder and one count of employing a firearm during the commission of a dangerous felony. Thereafter, the State entered a nolle prosequi on the attempted murder charge involving victim Haleaka Childress.

At the Defendant's trial, Lynn Waller, a deputy with the Dyer County Sheriff's Office, testified that on February 7, 2019, he was dispatched to Earl Carter Road following a shooting. When Deputy Waller first arrived on the scene a little before 5:00 p.m., he noted that an SUV was off the road in a ditch and that a white truck had collided with the front porch of a nearby house. He observed an older lady at the house tending to a woman, later identified as Haleaka Childress, who appeared to have been shot and seemed to be in pain. He also saw a man, later identified as Jesse Palmer,[1] the driver of the truck, who had been shot in the face and was panicking. Deputy Waller said Palmer told him that the SUV belonged to the Defendant, who had shot him. When Deputy Waller asked why the Defendant shot him, Palmer stated he did not know, and when he asked if it was over drugs, Palmer said, "No, I swear, I don't know." Deputy Waller said he tried to calm down Palmer because Palmer believed he was going to die from the gunshot wound to his face.

Deputy Waller said that he never saw the Defendant on the scene, just the Defendant's SUV. After securing the scene, he drove in the direction of the Defendant's home, and another man flagged him down, telling him he had just seen the Defendant jumping over a fence and running across a field with his crossbow in hand. Deputy Waller then saw the Defendant and a woman in the field and ordered them to stop. When Deputy Waller took the Defendant into custody, the Defendant said, "They tried to shoot me." When Deputy Waller asked him what he was talking about, the Defendant said, "Well, something went on." Deputy Waller noted that the Defendant never provided further explanation as to what happened. A short time later, Deputy Waller had his trained canine track the path that the Defendant followed, which led to the discovery of the Defendant's crossbow in the woods.

On cross-examination, Deputy Waller denied that the Defendant ever told him that Palmer had pulled a gun on him or that he took the gun from Palmer before he fired into Palmer's truck. Deputy Waller acknowledged that the Defendant's SUV was almost completely off the right-hand side of the road, with only the back corner of the vehicle still on the road.

On redirect examination, Deputy Waller noted that when he first approached the Defendant, the Defendant did not have any injuries and was "grinning real big" and acting

---

[1] We have spelled the witness's first name as "Jesse," in accordance with how this witness's name is spelled in both the indictment and his victim impact statement.

"[l]ike he was evil." Deputy Waller stated that the Defendant did not give him a gun. He said the Defendant never claimed that he took the gun away from Palmer or Clark and never offered to give him the gun because he was just defending himself.

On recross examination, Deputy Waller asserted that the Defendant appeared to be under the influence of methamphetamine at the time he took him into custody.

Rick Gregory, an investigator with the Dyer County Sheriff's Department, testified that on February 7, 2019, he was dispatched to the scene because there was an active shooter on the scene. Investigator Gregory took numerous photographs of the scene and observed that the victims' truck, which had been driven by Palmer, was "covered with blood." He identified several photographs of the truck that had crashed into the front porch and several photographs of the second house where another victim Bradley Clark had gone after being shot. Investigator Gregory said that Palmer's truck had two bullet holes—one below the gas fill area and one behind the left rear tire. He also identified photographs he took of the Defendant's SUV, where a nine-millimeter casing was found on the truck's floormat.

Jessica Byrd, a deputy for the Dyer County Sheriff's Office, testified that she was instructed to go past the location where Palmer and Childress were to another address on Earl Carter Road where victim Bradley Clark was located. Upon arriving there, she saw Clark, who had sustained an injury to his face and claimed he had been shot. At the time, she tried to get Clark to sit down because she was afraid he was going to pass out from his injury.

On cross-examination, Deputy Byrd acknowledged that Clark's mother attempted to grab him by the arm to pull him out of the ambulance so she could transport him to the hospital herself. She said Clark and his mother got into his mother's vehicle; however, when Deputy Byrd blocked Clark's mother's car from leaving as Deputy Byrd was awaiting instructions from her sergeant, Clark exited his mother's car and approached Deputy Byrd aggressively, indicating that he would hurt her if she did not allow them to pass. Deputy Byrd acknowledged that emotions were running high at that time and that she did not feel threatened by Clark's behavior.

Jesse Palmer, one of the victims in this case, testified that he was currently incarcerated at the Dyer County Jail while he was awaiting trial in an unrelated case. Palmer said that on February 7, 2019, he was with Bradley Clark and Haleaka Childress, and they were headed back to Clark's home after visiting friends. Palmer admitted that he had been drinking Crown Royal and using methamphetamine earlier that day, although he did not feel that he was under the influence of these substances when the shooting incident occurred. At the time, Palmer was driving Clark's truck, and he had turned onto Earl Carter

- 3 -

Road when he saw the Defendant driving toward them. Palmer said that he and the Defendant had been friends since they were young and that he had no issues with the Defendant before seeing him that day. However, Palmer acknowledged hearing about an incident, wherein the Defendant beat up Clark at Clark's home two weeks earlier. Palmer said that a few days after Clark's beating, he and Clark encountered the Defendant, who apologized to Clark for beating him up, and Palmer believed the issues between the Defendant and Clark had been resolved.

Palmer said that when he first saw the Defendant on February 7, 2019, the Defendant's SUV was "swerving back and forth," and he understood this to mean that the Defendant wanted to talk to them. Palmer said he stopped and rolled down his window, and the Defendant stopped his SUV right beside him and rolled down his window. At the time, the Defendant was drinking beer or alcohol from a bottle, and Palmer offered him some of his Crown Royal. The Defendant took a drink from the Crown Royal bottle and then the Defendant pulled out his gun, setting it on the windowsill of his SUV. Palmer asked the Defendant why he had pulled out his gun, and the Defendant provided a rambling reply. Palmer stated that the Defendant was routinely hyperactive and that he was generally concerned when in the presence of the Defendant, but he was particularly concerned that day because the Defendant had pulled out his gun. When Palmer continued to ask the Defendant why he had his gun out, the Defendant ignored his questions and asked Palmer if he wanted to buy some drugs. Palmer said he turned around and began talking to Childress and Clark, and the Defendant leaned over and pointed his gun at the back of Palmer's head. When Palmer turned back around to face him, the Defendant shot Palmer in the face from a distance of a few inches away. When asked to describe what it felt like to be shot, Palmer said, "I remember a loud noise . . . some burning, I remember my head going back real hard, I remember it going black for a moment, then white; and then I slowly started . . . actually see[ing] what was going on around me." Palmer stated that he heard two gunshots, with the first shot hitting him in the face and the second shot bringing him back to consciousness.

Palmer explained that the bullet that hit him entered his face and came out his neck, which "shattered [his] lower jaw" as well as "the top and the bottom of [his] mouth." He said this bullet also "cut the nerve that controls [his] facial movements on the left side of [his] face[,]" which caused him to have "facial palsy[,]" a sort of partial paralysis of his face. Palmer stated that once the Defendant fired the shots, Palmer's foot came off the brake, and his truck began to roll. He noted that the Defendant's SUV also rolled forward, and the Defendant was initially unable to get out of his SUV because the vehicles were so close together. When the Defendant finally exited his SUV, he held up his gun and fired toward the truck Palmer was driving. Palmer said he was able to drive off, and he turned into the first driveway he came to and rolled into the front porch of the house there. Palmer then jumped out, banged on the window, and yelled that they had been shot and needed

help, and the woman inside the house called 9-1-1. At the time, Palmer was bleeding from the front of his face, his mouth, and the back of his neck, and he was "freaking out because [he] thought [he] was going to die" Palmer was taken to the Dyersburg Hospital, which then transported him to The Med in Memphis for surgery. During this period of time, he was experiencing pain worse than any he had in his life. He said he continued to feel this pain until the hospital put him to sleep.

Palmer claimed that at the time the Defendant shot him, neither he, nor Childress, nor Clark possessed a gun. Palmer said that he never made any threats to the Defendant and never pulled out any weapons of any kind before the Defendant shot him. When asked why the Defendant shot him, Palmer said he "didn't see a reason for him to do it at all" because he believed he and the Defendant were "friends." He said he still did not know why the Defendant shot him.

On cross-examination, Palmer admitted that on March 30, 2010, he was convicted of promoting the manufacture of methamphetamine and received a four-year sentence. He also admitted that in July 2020, he was convicted of reckless endangerment with a deadly weapon. In addition, he acknowledged being charged with a third offense, for which he was currently incarcerated. Palmer admitted that the day of the shooting, he had smoked methamphetamine, and he asserted that the Defendant was normally on drugs. He also said that in the months prior to this incident, he and Clark were addicted to methamphetamine, and that he, Clark, and the Defendant were engaged in the drug trade. Palmer also admitted that he had drunk a quarter to a half of a pint of Crown Royal shortly before he encountered the Defendant on February 7, 2019.

Palmer said he first learned that Clark and the Defendant had gotten into a fight when he and Clark went to "Smitty's" house a few days before the shooting, and Clark said he was scared to go in because the Defendant was present. Palmer denied that Clark said he was going to get revenge on the Defendant. Instead, Palmer asserted that Clark was scared of the Defendant because the Defendant and some of the Defendant's friends had come to Clark's home and had beaten him up. Palmer said he was not aware of any Facebook posts where Clark had threatened to kill the Defendant.

Bradley Clark testified that he was currently serving a sentence for possession with the intent to sell methamphetamine. He admitted that he was addicted to marijuana and methamphetamine. Clark said that although he was currently incarcerated, he was headed to an in-patient drug rehabilitation program for six months. He acknowledged that his criminal history included other convictions, including a domestic violence conviction. Clark said that he and the Defendant became friends in 2018, and they often used methamphetamine.

Clark stated that approximately fifteen days prior to February 7, 2019, the Defendant informed him that Clark was going to have to choose whether to hang out with Palmer or the Defendant because Palmer had gotten the Defendant in trouble. Clark replied that he did not want to be told with whom he could hang around, and when Palmer suddenly appeared at his house, Clark encouraged the Defendant and Palmer to work out their differences. Clark said his conversation with the Defendant never became heated.

Clark asserted that two or three days after having this conversation with the Defendant, the Defendant appeared at his home with four of the Defendant's friends. Clark said he immediately felt "tension in the air[,]" and then the Defendant "sucker punched [him above his right ear] out of nowhere." Clark said this hit knocked him off balance and then the Defendant hit him another four or five times. Although the Defendant "beat [him] up pretty bad," Clark said he did not really fight back because he was trying to defend himself. At the time, Clark did not possess any weapons. After the fight, the Defendant and his friends walked out of Clark's home and left. After this beating, Clark said he felt "mad, angry, and betrayed, in a rage." He said he had no idea why the Defendant beat him up, and he claimed he was afraid the Defendant would hurt him again because the Defendant was "a big man." Clark said the Defendant kept telling him not to hang out with Palmer because Palmer would eventually get him in trouble over drugs.

Clark stated that after the Defendant beat him up, he sent the Defendant a Facebook message stating that he had recorded everything the Defendant told him over the phone, that he was watching him, that he could not run and hide, and that he would have the last laugh when the Defendant was stuck in jail. Clark also sent a message telling the Defendant that he had a crossbow for the purpose of "scar[ing] him away," even though Clark did not own a crossbow. Clark said he sent the Defendant these messages because he was "mad" after the Defendant "beat [him] up." Clark claimed he was fearful that the Defendant would come back and hurt him worse or hurt the eleven-year-old child living with him. Clark asserted that his intent to sending the Facebook messages to the Defendant was to keep him away from him.

Clark recalled that on February 7, 2019, he was with Jesse Palmer and Haleaka Childress, and they were coming back from Dyersburg. When they turned onto Earl Carter Road, they saw the Defendant driving directly toward them, which caused Palmer to pull over on the shoulder of the road. Clark said the Defendant "swerved" to miss hitting them, "slammed on [his] brakes[,]" and then backed up so they were lined up "driver window to driver window." Clark said Palmer asked the Defendant why he was swerving near them because Childress was eight months pregnant, and the Defendant started laughing. The Defendant suddenly quit laughing, and during this tense moment, Palmer noticed that the Defendant was drinking, so he handed the Defendant a bottle of liquor, and the Defendant took a drink. Clark stated that when the Defendant handed the liquor bottle back to Palmer,

the Defendant pulled out a gun and held it in Palmer's face. Palmer looked over at Clark, and when Palmer looked back at the Defendant and told him to put the gun up a couple of times, the Defendant shot him in the face.

Clark said that at the time, no one in Palmer's truck had a gun. Clark believed that the Defendant had fatally shot Palmer, who had fallen motionless against the steering wheel. The Defendant fired another shot, which hit Childress, jerking her head violently. The Defendant then fired a third shot, which hit Clark right above his lip, and Clark thought he was going to die. Clark denied being able to get out of Palmer's truck by the time the Defendant shot him. Once Clark was shot, he reached for the door handle and fell out of the truck.

Clark said that being shot felt like "the hardest hit" he had "ever taken" and "felt like a burning sensation, almost like somebody hit [him] with hot lava." After Clark fell out of the truck and was lying on the ground, he saw the Defendant get out of his SUV and begin walking toward the back of Palmer's truck. Clark believed the Defendant was coming to shoot him again to make sure he was dead. As the Defendant got to the back of Palmer's truck, Palmer's tires started squealing like he was trying to drive off. Clark said he knew he needed to get up right then or he was going to die. Clark saw the Defendant pointing his gun at the back of the truck towards Palmer and Childress, and when Clark stood up, the Defendant spotted him and pointed his gun at Clark, and Clark ran through the field toward a ditch.

As Clark was running, he heard several more shots and felt a few bullets fly by him. When Clark got to the ditch, he tried to jump over it, but he fell into the middle and climbed up the other side. He looked back at the Defendant, who was pacing back and forth near the vehicles, and Clark dialed 9-1-1 as he walking down a trail. At the time, Clark knew most of his teeth on the left side of his face were missing because he had spit them out. Clark was eventually taken to the hospital, where he was put in a medically-induced coma. He said his doctors woke him once to re-inflate his lung and then put him back into a coma. Clark's gunshot injury to the face forced him to have multiple surgeries, including five reconstructive surgeries at Vanderbilt, where doctors removed bone fragments and tooth fragments from his tongue and the roof of his mouth. Clark said to this day he continued to have bone and tooth fragments coming to the surface and continued to have pain in his jaw and difficulty eating. He said the Vanderbilt physicians also had to remove half of his tongue on the left side and had to remove bullet fragments from his face. He noted that his doctors actually left a bullet fragment in his throat because it would have caused more damage to remove it. Clark said he still did not know why the Defendant shot him.

On cross-examination, defense counsel challenged Clark's testimony about sending the Facebook messages because he was afraid of the Defendant, and Clark asserted that the

Defendant had "intimidated [him], so [he] felt the best thing to do was intimidate him back." Clark acknowledged that he sent these Facebook messages to the Defendant approximately two weeks prior to the shootings but denied that he threatened the Defendant in these messages. Clark admitted that on February 7, 2019, at 4:32 a.m., the same day as the shootings, he shared a post on his Facebook page, which originally had been posted by another individual, which stated: "Mfs think cause you avoid the drama you not with the shits. Bitch I'll kill you." Clark replied to this post by stating, "I understand this completely and whole heartedly [sic]." Although Clark acknowledged sharing and responding to the aforementioned post, he denied that he was trying to threaten Defendant with it.

Clark admitted that he had been convicted of aggravated assault on September 12, 2012, and received a three-year sentence for this conviction. In addition, he admitted that he had been convicted of possession of methamphetamine with intent to deliver on August 17, 2012, for which he was currently incarcerated. He said on the same date, he was also convicted of aggravated burglary.

Clark denied using methamphetamine or marijuana on February 7, 2019, but admitted he had used methamphetamine in the weeks leading up to that day. Clark admitted telling an officer during his interview on February 21, 2019, that he smoked some marijuana the day of the shooting. Clark said he informed Palmer that the Defendant had beaten him up at his home a few days before the shootings. Palmer saw the marks from the beating on Clark's arm, and he asked him about it. However, Clark claimed that he never told Palmer all of the details about the beating.

Clark denied having a gun on February 7, 2019, and claimed that he did not own a gun at that time. He said that he saw the Defendant pull a gun on Palmer and then saw the Defendant pull the trigger. However, he admitted telling the officer during his interview on February 21, 2019, that he never saw a gun the day he got shot.

The Defendant, Robert Bevis, Jr., did not testify at trial.

Jack Flora, a corporal with the Dyer County Sheriff's Department, testified that on February 7, 2019, he went to a home on Earl Carter Road and made contact with Bradley Clark. At the time, Clark appeared to be in shock and was standing in front of the home. Corporal Flora said that after Clark was taken to the hospital, he found a glass pipe, commonly used to ingest drugs, and a cell phone in the flower bed in front of the home, just a few feet from where Clark had been standing. He said the owner of the home denied that the pipe or cell phone belonged to him. On cross-examination, Corporal Flora acknowledged that he did not know to whom the cell phone or the glass pipe belonged.

Wesley Brasfield testified that he knew Bradley Clark and the Defendant and that he was present at Clark's house in January 2019 when the Defendant and Clark fought. Brasfield said that the Defendant and Clark began arguing, and then Clark shoved the Defendant, and they got into a fight. Brasfield said that he broke up the fight, and as they were leaving, Clark pulled out an assault rifle. He said Clark never actually fired the rifle at them because when he went to load it, the clip fell out of it. Brasfield claimed he was scared when Clark pulled out the rifle because he believed that he and the men with him were about to be shot.

On cross-examination, Brasfield admitted that he was the Defendant's cousin. He also admitted that he had smoked marijuana, used methamphetamine, and had been drinking alcohol the day of the fight between the Defendant and Clark. However, he asserted that he did not observe the Defendant using drugs or drinking alcohol that day. He said he rode with the Defendant and two other men to Clark's home the night of the fight. Brasfield said he and the Defendant went into Clark's home, although the other two men with them may have come inside as well. When they entered the home, Clark was sitting on his bed, and the Defendant and Clark began arguing about a phone. He said that Clark initially shoved the Defendant, and the Defendant beat Clark up, hitting him more than two or three times. Brasfield said that although Clark was trying to fight back, he ended up getting beaten up by the Defendant. Brasfield ultimately broke up the fight, and he and the Defendant and the men with them left because they believed the police were coming. As they were trying to leave in their vehicle, they saw another car on Clark's property. Braswell said that Clark then exited his home, and when Clark cocked his rifle, "the clip fell out."

The State called Mildred Cook as a rebuttal witness. Cook said that she was Bradley Clark's grandmother and that she lived across the street from Clark. She said the night of the January 2019 fight, she went to Clark's home so they could go to the store for plumbing supplies, and she parked behind a truck and then honked her horn for Clark. As she did so, "some boys ran out of the house and jumped in the truck" and began backing up. She said they did not give her a chance to get out of the way, so she put her vehicle in reverse so they could get by her to leave. She said the truck with the men immediately left, and she never saw Clark come outside while the truck was on his property. After the truck left, Clark came out of his home holding his arm and told her he had gotten into a fight with the men who had just left. Cook said she never saw Clark with a gun that night and that Clark did not have a gun at that time. She also said that she had never known Clark to have an assault rifle. Cook denied that Clark had pointed a gun at the men in the truck before they left.

At the conclusion of trial, the jury convicted the Defendant of the two counts of attempted first degree premeditated murder and the one count of employing a firearm

during the commission of a dangerous felony. During a bifurcated hearing, the jury heard proof that the Defendant had two prior convictions for sale of over .5 ounce of marijuana, which were Class E felonies, and a prior conviction for the sale of methamphetamine under .5 gram, which was a Class C felony, at the time the Defendant committed the firearm offense. Ultimately, the jury determined that the Defendant had a prior felony conviction at the time he committed the firearm offense. The trial court then sentenced the Defendant to concurrent sentences of thirty-five years at eighty-five percent for the attempted murder convictions and a consecutive sentence of ten years at one hundred percent for the firearm conviction.

Thereafter, the Defendant timely filed a motion for new trial and then filed an amended motion, alleging in pertinent part that the trial court should have granted a mistrial because of the disruptive conduct by witnesses and family members in the gallery; that the evidence was insufficient to sustain his convictions; that the trial court failed to provide a curative instruction when the State unfairly stated during closing argument that the Defendant admitted to possessing a firearm; and that the trial court erred by failing to provide an instruction regarding the voluntary intoxication of the Defendant and by failing to provide an instruction on attempted first degree murder without serious bodily injury. Following a hearing, the trial court denied the motion for new trial, and the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Mistrial.** The Defendant argues the trial court erred in failing to declare a mistrial in response to numerous outbursts by the victims' families. He claims that these outbursts required several jury-out hearings, which resulted in the trial court providing harsh warnings to the disruptive parties. While the Defendant acknowledges that the trial court warned the disruptive parties, he claims that such warnings were "insufficient to un[-]ring the bell of prejudice" and ultimately tainted the jury's verdict. In response, the State asserts that the Defendant waived this issue by failing to request a mistrial until his motion for new trial and that the Defendant, who failed to request plain error review, has failed to show that this amounted to plain error. We agree with the State.

At a bench conference, outside the hearing of the jury, that immediately followed defense counsel's opening statement, the trial court advised the State that it would make the victims' families leave the courtroom if they were unable to be still, remain quiet, and stop showing their dissatisfaction with defense counsel. The State assured the court that it would pass this message on to the victims' families.

After the conclusion of Deputy Waller's testimony and following the jury's dismissal for lunch, the trial court announced to the individuals in the gallery that it was

"concerned about the participation of those who are here to observe the trial." The trial court then said, "I don't want to see another expression. I don't want to hear another peep out of anybody who's here. If you're unhappy with what lawyers are saying, or what the witness is saying, I'm sorry. That's part of the trial." The court then added, "So we're going to all be quiet and respectful, or we're going to have this trial without anybody sitting in the gallery. Those are the only two choices I've got, and don't make me make that choice, because I will without hesitation." The trial court then directly addressed the Defendant, stating, "Mr. Bevis, I know from time to time, things are gonna [sic] be said that you absolutely disagree with. I understand that, but remember, to voice or to have a problem, it doesn't help your cause. Okay?" The Defendant replied that he understood.

In his amended motion for new trial, the Defendant asserted that "[t]he trial court should have granted a mistrial due to disruptive conduct by witnesses and family members in the gallery." The trial court, in its order denying the motion for new trial, made the following findings and conclusions with regard to this issue:

> During the trial, the [c]ourt observed both the Defendant and two or three persons in the gallery of the courtroom acting in an animated manner in response to testimony or questions posed by the attorneys. The [c]ourt directed the State to let the spectators know that . . . they would be excluded if their conduct continued. At one point, the [c]ourt admonished both the Defendant and the spectators outside the presence of the jury that a condition of remaining in the courtroom was that their behavior not disrupt the proceedings. The [c]ourt did not observe the jurors notic[ing] any of this behavior. There were no further problems with either the Defendant nor spectator conduct during the trial. The conduct did not affect the proceedings but attracted my attention. This ground is overruled.

Initially, we note that the Defendant waived this issue by failing to cite to the pertinent portions of the record when raising this issue in his brief. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on.").

In addition, we agree with the State that the Defendant waived this issue by failing to request a mistrial in response to the disruptions. Here, the trial court initially advised the State, outside the hearing of the jury, that it would require the victims' families to leave the courtroom if they were unable to remain quiet. The trial court later instructed the

- 11 -

disruptive parties, after the jury was dismissed, that they had to be quiet and respectful during the trial or they would be required to leave the courtroom. We note that when these disruptions occurred during trial, the Defendant never contemporaneously objected or requested a mistrial, and he raised this issue for the first time in his motion for new trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Robinson, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997) ("[F]ailure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue absent the existence of plain error."). Accordingly, we agree with the State and conclude that the Defendant waived plenary review of this issue by failing to take whatever action was available "to prevent or nullify the harmful effect of an error." Because the Defendant has waived this claim, we may only review this issue for plain error. See Tenn. R. App. P. 36(b). However, the Defendant has neither request plain error relief nor has provided any analysis of the five factors required for plain error review.

In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted). It is the defendant's burden to persuade an appellate court that the trial court committed plain error. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. A recognition of plain error "should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

First, the record does not clearly establish what occurred in the trial court. Although the Defendant claims that the victims' families caused numerous disruptions at trial and although the trial transcript makes general references to these disruptions, the transcript does not specifically detail the substance of these outbursts. While the record does contain the motion for new trial and the order denying the motion on this issue, the Defendant did

not include the transcript for the motion for new trial in the appellate record. However, the portions of the record that were included and are relevant to this issue do not clearly establish what occurred in the trial court regarding these disruptions.

In addition, the Defendant has failed to show that a clear and unequivocal rule of law has been breached or that a substantial right of the accused was adversely affected. The Defendant claims that the disruptive conduct from the victims' families affected his right to an impartial jury and that the trial court's admonishment to these individuals, outside the hearing or presence of the jury, was insufficient to remove the prejudice from these disruptions. However, the Defendant, as noted above, has failed to provide enough information regarding these disruptions to show that they impacted the jury in any way. Accordingly, the Defendant has failed to show that a clear and unequivocal rule of law was breached or that a substantial right belonging to him was adversely affected.

Lastly, the Defendant has failed to establish that consideration of the error is necessary to do substantial justice. "'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). A trial court should declare a mistrial "only upon a showing of manifest necessity." State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004) (citing State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003)). In this case, the Defendant has not established that the disruptive behavior of the victims' families precluded an impartial verdict. In its order denying the motion for new trial, the trial court found no suggestion that the jury ever noticed the disruptive behavior. In addition, the trial court found that the disruptive behavior stopped after the court issued its warning to the relevant individuals outside the presence of the jury. Because the Defendant has failed to establish the requirements for plain error, he is not entitled to relief on this issue.

**II.  Sufficiency of the Evidence.**  The Defendant also argues that the evidence is insufficient to sustain his convictions for attempted first degree premeditated murder with serious bodily injury and for employing a firearm during the commission of a dangerous felony. Specifically, he claims that the proof at trial established that he had reason to fear the victims, which supported his claim of self-defense, and that the victims were not credible. Consequently, the Defendant asserts the trial court should have set aside the jury's verdicts on the grounds that no reasonable jury could have found him guilty beyond a reasonable doubt. In response, the State contends that the Defendant is not entitled to relief because the jury resolved any questions concerning the victims' credibility with its verdict and because a rational jury could have found from the evidence presented that the Defendant did not act in self-defense and was guilty beyond a reasonable doubt of the conviction offenses. We agree with the State.

- 13 -

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379. When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be[.]" Tenn. Code Ann. § 39-12-101(a)(1). First degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1) (Supp. 2019). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d) (Supp. 2019). This section further defines premeditation:

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind

- 14 -

of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing Bland, 958 S.W.2d at 660); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

While serious bodily injury is not an element of attempted first degree murder, a defendant found guilty of attempted first degree murder "where the victim suffers serious bodily injury as defined in § 39-11-106," is not eligible for release until he serves eighty-five percent of his sentence. Tenn. Code Ann. § 40-35-501(k)(5) (Supp. 2018). Serious bodily injury is defined as bodily injury that involves (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) a broken bone of a child who is twelve years of age or less. Id. §§ 39-11-106(a)(34)(A)-(F) (Supp. 2018). This Court has held that the subjective nature of pain is a fact to be determined by the trier of fact. State v. Dedmon, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006).

The Defendant was also charged with employing a firearm during the commission of a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1)-(2) (Supp. 2018). Attempt to commit first degree murder is statutorily defined as a "dangerous felony." Id. § 39-17-1324(i)(1)(A).

In his motion for new trial, the Defendant argued that the evidence was insufficient to sustain his convictions. In his amended motion for new trial, the Defendant claimed that

"[t]he trial court erred by failing to set aside his conviction[s] in its role as '13th Juror' when the jury's verdict was not substantiated by the weight of the evidence" and where the "the jury's verdict found serious bodily injury without any evidence of medical records." In the order denying these motions, the trial court held that it had "considered its role as thirteenth juror and finds that there is ample evidence to support the jury's verdict."

First, the Defendant argues that the proof established he had reason to fear both victims, which supported his claim that he shot both victims in self-defense. He claims that both victims admitted to prior altercations with him that would have given them an incentive to harm him and would have caused the Defendant to have a reasonable fear of the victims. In particular, the Defendant asserts that the same day of the shootings victim Bradley Clark wrote threatening comments in private messages to him and then publicly commented about his intent to get revenge on him.

Self-defense is a complete defense to an offense. Id. § 39-11-601; State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). At the time of the offenses in this case, Tennessee Code Annotated section 39-11-611(b)(1)-(2) provided:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Id. § 39-11-611(b)(1)-(2) (Supp. 2019). When a defendant relies upon the theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a question of fact for the jury. State v. Echols, 382 S.W.3d 266, 283 (Tenn. 2012); State v.

Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); Ivy, 868 S.W.2d at 727. Consequently, the jury is free to reject a defendant's claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

In State v. Perrier, 536 S.W.3d 388, 401 (Tenn. 2017), the Tennessee Supreme Court held that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat[,]" rather than a total bar to self-defense. "[A] duty to retreat does not mean that a person cannot defend herself or himself." Id. at 404. However, a defendant engaged in unlawful activity "must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of" using force. Id. (citation and internal quotation marks omitted). The court explained that "the trial court makes the threshold determination whether to charge the jury with self-defense, and . . . as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat." Id. at 403. The court added, "As part of that decision, the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." Id.

In the instant case, the jury was instructed that the Defendant had a duty to retreat before using force because the Defendant was engaged in unlawful activity at the time he shot the victims, namely he possessed a firearm as a convicted felon. Based on the evidence presented at trial, a rational jury could have rejected the Defendant's claim that he acted in self-defense. The jury heard the Defendant's statement to Deputy Waller that the victims tried to shoot him at the scene; the jury also heard that the Defendant blamed Palmer for getting him in trouble over drugs, that the Defendant had gotten into an earlier fight with Bradley Clark, and that Clark had sent the Defendant several Facebook messages, which the Defendant could have been interpreted as threats. On the other hand, the jury heard Deputy Waller testify that the Defendant was "grinning . . . like he was evil" when he claimed that the victims tried to shoot him." The jury also heard Clark claim that he sent the Facebook messages to protect himself rather than to threaten the Defendant and heard Mildred Cook and Clark testify about how the Defendant had beaten up Clark in January 2019. Moreover, as we will explain in more detail below, the jury heard proof that the Defendant initiated contact with the victims just before the shooting, that the Defendant pulled a gun on the victims without any provocation, that the Defendant shot both victims in the face even though they were unarmed, that the Defendant never sought aid for the victims after shooting them, that the Defendant was uninjured following the shootings, that the victims' truck contained two bullet holes, and that a nine-millimeter casing was found on the floormat of the Defendant's SUV. Although there was some proof that the Defendant had reason to fear both victims, the jury, by its verdict, clearly accredited the State's proof concerning the incident and rejected the Defendant's claim of self-defense.

- 17 -

Second, the Defendant contends that the victims were not credible. He claims, without citation to the record, that both victims admitted to providing untruthful statements, not only to the police after the incident but also in their testimony at the preliminary hearing and at trial. The Defendant also asserts that both victims admitted they were under the influence of methamphetamine or alcohol at the time of the incident. Finally, the Defendant asserts that both victims testified against him at trial while they were incarcerated for possessing and manufacturing methamphetamine. He suggests that the victims had "sufficient personal incentive to lie" during their testimony because at the time of his trial, Jesse Palmer had a pending criminal charge and Bradley Clark was supposed to receive drug treatment in lieu of a felony prison sentence.

Victims Palmer and Clark both testified that the Defendant initiated contact with them by stopping his SUV and then reversing until the driver's side windows of both vehicles were only a short distance apart. The victims, who testified that they were unarmed, stated that Palmer offered the Defendant a drink, which the Defendant accepted. When Palmer turned away to talk to Clark, the Defendant pulled out his gun and pointed it at the back of Palmer's head. When Palmer turned back around to face him, the Defendant, without provocation, shot Palmer in the face from a few inches away. The Defendant then fired two more shots, including one that hit Clark in the face. Thereafter, the two vehicles rolled apart, and then the Defendant exited his SUV, walked toward the back of the victims' truck, and fired shots at the truck. When the Defendant saw Clark lying on the ground, Clark jumped up and ran through a nearby field as the Defendant fired several shots at him. Law enforcement later found two bullet holes in the victims' truck and recovered a nine-millimeter casing on the floor of the Defendant's SUV. Both Palmer and Clark testified regarding extensive, horrific injuries to their face, head, and neck that doubtlessly constituted serious bodily injury. By its verdict, the jury resolved any issues regarding credibility or conflicting evidence in favor of the State's witnesses. Accordingly, we conclude that the evidence, when viewed in a light most favorable to the State, is more than sufficient to sustain the Defendant's convictions for two counts of attempted first degree premeditated murder with serious bodily injury and one count of employing a firearm during a dangerous felony.

We also detect an error in the Defendant's judgment form in Count 4. Although the Defendant was charged with and convicted of employing a firearm during the commission of a dangerous felony, which is a Class C felony, see Tenn. Code Ann. §§ 39-17-1324(b), (e)(1), (h)(2), the judgment form in Count 4 erroneously shows that the Defendant was convicted of possession of a firearm during the commission of a dangerous felony, incorrectly lists this offense as a Class C felony, and then accurately reflects a ten-year sentence at one hundred percent served consecutively to his other sentences. Because the record clearly shows that the Defendant in Count 4 was indicted for and convicted of the offense of employing a firearm during the commission of a dangerous felony, a Class C

- 18 -

felony, we remand this case to the trial court for entry of a corrected judgment form reflecting this conviction offense, class, and ten-year sentence served consecutively to his sentences in Counts 2 and 3.

**III. <u>Allegations of Prosecutorial Misconduct.</u>**  The Defendant also argues the trial court erred in overruling his objection when the prosecutor misrepresented the evidence by stating that the Defendant had admitted to using a gun during the incident, which he claims also constituted an improper comment on his invocation of the right against self-incrimination.  He claims that the State's argument during closing, that the Defendant never denied possessing or firing a gun, relies on the assumption that the Defendant would have explicitly denied it by testifying at trial if he had not possessed or fired the gun.  In response, the State asserts that the Defendant waived this prosecutorial misconduct claim by raising it for the first time on appeal and that the Defendant is not entitled to plain error relief.  We conclude that the Defendant has waived this issue for the reasons that follow and that the Defendant is not entitled to plain error review.

The Defendant, while acknowledging that he pursued a theory of self-defense at trial, also claims that he pleaded not guilty throughout the proceedings, did not provide a written statement to police admitting that he shot the victims, and invoked his right against self-incrimination at trial.  He contends that the State "knowingly, intentionally, and falsely represented that [he] made admissions of guilt that are nowhere in the record of evidence." The Defendant also asserts that the trial court never provided a curative instruction or other remedy in response to the State's argument during closing and then the court "excoriated" the Defendant for "standing silent" and "failing to deny that he possessed or used a gun." Moreover, the Defendant argues that the State's comments during closing were "calculated to inflame the passions of the jury" and that regardless of whether they stemmed from a misrepresentation of the evidence or an improper comment on his invocation of his right to silence, they were not harmless beyond a reasonable doubt.

In this case, the State made the following assertion during its final closing argument:

> And then, the defendant's primary defense is gonna [sic] be all these inconsistencies.  Well, let's talk about things that we know.  Let's talk about things that are not inconsistent, things that are not rebutted, things that [the Defendant] has not denied.  First one, [the Defendant] had a gun.  He doesn't deny that.  He admits, yep, I had a gun.  Second thing, he fired that gun.  He doesn't deny that.

Upon hearing this, the defense immediately requested a bench conference, wherein defense counsel claimed that the State was "arguing facts not in the evidence" because the Defendant had never made a statement that he fired the gun at the victims.  The State

- 19 -

countered that the Defendant "admitted he shot them." When the trial court asked if the Defendant's admission came in as evidence, the State replied that the Defendant was "claiming self-defense" and that "he shot [the victims] because he was in fear of them[,]" which constituted the Defendant's "whole defense." The trial court interjected, "I think it's a fair argument because your defense is self-defense." Defense counsel responded that the Defendant had never made a statement that he shot the victims. The State clarified, "I didn't say he said it. [The Defendant] admitted that he fired the gun when it was in self-defense." The trial court agreed this was "true," and defense counsel replied, "Okay. All right." The defense never requested a curative instruction or any other remedy during this bench conference.

The Defendant, in his amended motion for new trial, specifically reserved only the issue that "[t]he trial court failed to provide a curative instruction when the prosecution unfairly characterized the defendant as having admitted to possession of a firearm." In the order denying the motion for new trial, the trial court made the following findings and conclusions:

> The Defendant did not make a formal admission of possessing a weapon to law enforcement other than his interaction with Deputy Waller. The State's argument was based upon that encounter. The jury was free to accept or reject that argument and any implication arising from the Defendant's statement to Deputy Waller. Defendant's counsel did not request that the Court instruct the jury to disregard the State's argument. The Defendant's opening statement asserted that the Defendant had acted in self-defense. This ground is overruled.

While the defense objected to the State's closing argument, defense counsel never asked the trial court to provide a curative instruction or other remedy in response to the State's argument. A trial court should provide a curative instruction once an objection to improper argument is made. State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). However, if the trial court fails to give a curative instruction sua sponte, then counsel for the party has the obligation to request the trial court to provide a curative instruction. Id. If the party fails to request a curative instruction, or is dissatisfied with the instruction and fails to request a more complete instruction, then the party waives this issue for appellate purposes. Id. Because the Defendant never asked the trial court for a curative instruction or other remedy in response to the State's argument, he has waived this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Bell, No. M2019-01810-CCA-R3-CD, 2021 WL 794771, at *6 (Tenn. Crim. App. Mar. 2, 2021) (reiterating that when a defendant fails to ask for a curative instruction, he waives the issue on appeal).

- 20 -

In addition, the Defendant never raised the self-incrimination claim during the bench conference at trial and never included this particular claim in either his original motion or amended motion for new trial. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . the misconduct of . . . parties or counsel . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). In addition, the Defendant never raised a stand-alone prosecutorial misconduct claim in any of his motions for new trial. Accordingly, the Defendant has waived these issues.

While this court may consider an otherwise waived issue for plain error, the Defendant has not asked for plain error review, much less shown that he is entitled to plain error review. See Tenn. R. App. P. 36(b); Smith, 24 S.W.3d at 282. At trial, Deputy Waller testified that when he took the Defendant into custody, the Defendant said, "They tried to shoot me." When Deputy Waller asked him what he was talking about, the Defendant said, "Well, something went on," but never provided further explanation regarding what happened. Deputy Waller also stated that at the time he took the Defendant into custody, the Defendant did not have any injuries and was "grinning real big" and acting "[l]ike he was evil." The Defendant's entire defense at trial consisted of a theory of self-defense. During opening statement, defense counsel argued that by the end of trial the jury would be "convinced . . . that [the Defendant] was acting in self-defense" and that the State had failed to prove that the Defendant "was not acting in self-defense," which is what the State is required to do. Defense counsel also repeatedly argued during his closing that the State had failed to prove "that [the Defendant] did not act in self-defense." Given the proof offered and the Defendant's consistent pursuit of a self-defense theory at trial, we conclude the Defendant has failed to establish that the prosecution's remark during closing breached a clear and unequivocal rule of law, adversely affected a substantial right belonging to him, or necessarily must be considered in order to do substantial justice. Therefore, the Defendant is not entitled to plain error relief with regard to this issue.

IV. **Jury Instructions.** Lastly, the Defendant contends that the trial court committed prejudicial error in failing to provide a jury instruction on voluntary intoxication and on attempted first degree murder without serious bodily injury, which he claims is a lesser included offense of attempted first degree murder with serious bodily injury. The State counters that the Defendant has waived this issue by failing to request these instructions in writing and that the Defendant has neither requested nor established that he is entitled to plain error review. We agree with the State.

"[A] defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper

instructions." Dorantes, 331 S.W.3d at 390. Because challenges to jury instructions present mixed questions of law and fact, this court reviews challenged instructions de novo without a presumption of correctness. State v. Smith, 492 S.W.3d 224, 245 (Tenn. 2016). When a party wants the trial court to provide a particular jury instruction, that party must first provide the court with a written request for the instruction and provide counsel with a copy of the same. Tenn. R. Crim. P. 30(a); see State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (reiterating that because "the request was not made in writing, the trial court did not err in refusing to instruct the jury on intoxication"). A failure to request an instruction in writing will result in a waiver of this issue on appeal. See State v. Leath, 461 S.W.3d 73, 106-07 (Tenn. Crim. App. 2013); State v. Winton, No. M2018-01447-CCA-R3-CD, 2020 WL 1950777, at *6 (Tenn. Crim. App. Apr. 23, 2020).

First, the Defendant argues that the trial court failed to instruct the jury regarding his intoxication during the incident. He claims that because intoxication operates to negate mens rea rather than as an affirmative defense, it is immaterial that his intoxication was most likely voluntary. He also asserts that because attempted first degree murder requires the mens rea of "malice," the trial court's failure to instruct on the relationship between intoxication and mens rea undermines the reliability of the jury's verdict in this case.

We agree with the State that the Defendant has waived plenary review of this issue because the record does not contain a written request for a jury instruction on voluntary intoxication. Accordingly, the Defendant is not entitled to relief regarding the trial court's failure to give the voluntary intoxication instruction to the jury unless he establishes plain error. See Tenn. R. App. P. 36(b). However, the Defendant neither requested plain error review nor established that the court's failure to charge voluntary intoxication amounted to plain error. Smith, 24 S.W.3d at 282.

Voluntary intoxication "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code. Ann. § 39-11-503(a); see 7 Tenn. Prac. Pattern. Jury Instr. T.P.I.—Crim 40.02. "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." Hatcher, 310 S.W.3d at 814. "However, '[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent.'" Id. (footnote omitted) (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979); see Mills v. State, No. W2005-00480-CCA-R3-PC, 2006 WL 44381, at *8 (Tenn. Crim. App. Jan. 5, 2006) ("[W]hile intoxication is not in itself a defense to prosecution, a defendant's intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state."). This court has emphasized that "[t]he

- 22 -

determinative question is not whether the accused was intoxicated, but what was his mental capacity." Harrell, 593 S.W.2d at 672.

In his amended motion for new trial, the Defendant argued that the trial court had "failed to instruct the jury regarding voluntary intoxication of the [D]efendant." In its order denying this motion, the trial court held:

> The [c]ourt did not instruct on the issue of voluntary intoxication. There was testimony from Officer Waller that he believed the Defendant to be under the influence of methamphetamine when he encountered him after the incident. The Defendant had been driving an automobile just prior to the encounter and engaged in conversation with the officer. The Defendant did not present any proof of the Defendant's intoxication. Proof of voluntary intoxication sufficient to make an issue of the Defendant's ability to form the necessary mental state was not fairly raised in the proof and would have required the jury to speculate in the absence of proof. This ground is overruled.

Here, the Defendant failed to present any proof that intoxication from alcohol or drugs deprived him of the mental capacity to form culpable mental state required for the charged offenses. See Hatcher, 310 S.W.3d at 814. Instead, the Defendant consistently argued at trial that the victims' testimony was not credible and that the Defendant acted in self-defense. Because the Defendant has not shown that a clear and unequivocal rule of law was breached; that a substantial right belonging to him was adversely affected; or that consideration of the error is necessary to do substantial justice, the Defendant is not entitled to plain error relief on this issue.

Second, the Defendant contends that the trial court failed to charge attempted first degree murder without serious bodily injury as a lesser included offense of attempted first degree murder with serious bodily injury. He argues that attempted first degree murder without serious bodily injury is a lesser included offense under part (b) of the test in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), because it consists of conduct constituting a lesser degree of harm.

Initially, we note that the record does not contain a written request for a jury instruction on attempted first degree murder without serious bodily injury. See Tenn. R. Crim. P. 30(a). Moreover, all requests for lesser included offenses must be made in writing. Tenn. Code Ann. § 40-18-110(b). If a defendant fails to make a written request for an instruction of a lesser included offense, the instruction is waived, and the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal. See id. § 40-18-110(c); State v. Page, 184 S.W.3d 223, 229 (Tenn. 2006).

- 23 -

Because the record does not contain a written request for an instruction for first degree murder without serious bodily injury, we agree with the State that the Defendant has waived plenary review and is not entitled to relief unless he establishes plain error. See Tenn. R. App. P. 36(b); Smith, 24 S.W.3d at 282. Nevertheless, the Defendant has once again failed to request or show that he is entitled to plain error relief on this issue.

In his amended motion for new trial, the Defendant argued that the trial court had "failed to provide an instruction on attempted first degree murder without serious bodily injury," which he claimed was "a lesser included offense" under the Burns test." The trial court, in its order denying the motion for new trial, held:

> In the [c]ourt's view, an instruction on attempted first degree murder which does not include the requirement that the victim suffer serious bodily injury would have made conviction more likely by removing a necessary element of the offense as contained in [T.P.I.]—Crim. 4.01(a). Moreover, the charge suggested by the Defendant, which was not requested at trial, represents the same level of offense rather than a lesser[]included offense, except for the calculation of the Defendant's sentence release eligibility. This ground is overruled.

We reiterate that while serious bodily injury is not an element of attempted first degree murder, a defendant found guilty of attempted first degree murder "where the victim suffers serious bodily injury as defined in § 39-11-106," is not eligible for release until he serves eighty-five percent of his sentence. Tenn. Code Ann. § 40-35-501(k)(5). Accordingly, the phrase "with serious bodily injury" is properly categorized as a sentencing enhancement, rather than an additional element of the attempted first degree murder offense. See Thomas v. State, No. E2022-00160-CCA-R3-PC, 2023 WL 2062518, at *1 (Tenn. Crim. App. Feb. 17, 2023) (stating that "[t]he Petitioner's indictment did not include the 'serious bodily injury' sentencing enhancement, but the Petitioner's pleading guilty to the enhancement was a condition of his plea agreement"); Rogers v. State, No. W2022-00019-CCA-R3-PC, 2022 WL 6957427, at *8 (Tenn. Crim. App. Oct. 12, 2022) (reiterating the holding in Vaughn that serious bodily injury is not an element of attempted first degree murder); State v. Vaughn, No. W2016-00131-CCA-R3-CD, 2016 WL 7102748, at *6 (Tenn. Crim. App. Dec. 6, 2016) (stating that "serious bodily injury is not an element of attempted first degree murder" and that a defendant found guilty of attempted first degree murder, where the victim suffers serious bodily injury as defined Code section 39-11-106, is not eligible for release until after service of eight-five percent of the sentence). Because "serious bodily injury" is not an element of the charged offense of attempted first degree murder, the offense of attempted first degree murder without serious bodily injury is not a lesser included offense. The Defendant has not shown that the trial

court's failure to charge attempted first degree murder without bodily injury breached a clear and unequivocal rule of law, adversely affected a substantial right belonging to him, or must necessarily be considered in order to do substantial justice. Accordingly, the Defendant is not entitled to plain error relief on this issue.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the trial court's judgments are affirmed but the case is remanded for entry of a corrected judgment form in Count 4 to reflect the accurate conviction offense of employing a firearm during the commission of a dangerous felony.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE